1  Bret Uhrich, WSBA #45595
2  Jillian Harlington, #48136
   Walker Heye Meehan & Eisinger, PLLC
3  1333 Columbia Park Trail, Suite 220
   Richland, WA  99352
4  Telephone: (509) 735-4444
5  Attorneys for Plaintiffs

6

7

8              UNITED STATES DISTRICT COURT

9             EASTERN DISTRICT OF WASHINGTON

10

11  GREG WILLIAMS and RACHELUE       | Cause No.  4:19-cv-5075
    WILLIAMS, a marital community,   |
12                                   | COMPLAINT FOR DAMAGES
13                      Plaintiff,   |
    v.                               |
14                                   |
    QUALITY SERVICES MOVING, INC.,   |
15  a Virginia Corporation and EDWARD|
    GRAVES,                          |
16                                   |
17                      Defendants.  |

18          **I.  PARTIES, JURISDICTION & VENUE**

19

20      1.    Plaintiffs Greg Williams and Rachelue Williams are a marital

21  community residing in Richland, Washington, at all times relevant hereto.

22      2.    Quality Services Moving, Inc. (QSM) is a Virginia Corporation

23  headquartered in the State of Virginia which contracts to perform transportation

24

25

COMPLAINT FOR DAMAGES - 1

1333 Columbia Park Trail, Suite 220
Richland, WA 99352
P (509) 735-4444
F (509) 735-7140

WALKER
HEYE
MEEHAN
EISINGER

services across the country, including shipment of goods to the Eastern District of Washington.

3.      Edward Graves is an individual residing Virginia whose tortious action was directed to the Eastern District of Washington.

4.      The Court has jurisdiction pursuant to 28 U.S.C. § 1331 as this civil action arises under the Constitution, laws, or treaties of the United States.

5.      The Court has further jurisdiction pursuant to 28 U.S.C. § 1332 in regard to the state law claims set forth herein because there is complete diversity between Plaintiffs and Defendants and amount in controversy exceeds $75,000.00 exclusive of interests and costs. The alternative, the Court has supplemental jurisdiction over the state law claims because the claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.

6.      Venue in this matter is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of Washington. Venue is further proper under 49 U.S.C. § 14706(d)(1) because Washington is a state through which QSM operates.

1333 Columbia Park Trail, Suite 220
Richland, WA 99352
P (509) 735-4444
F (509) 735-7140

WALKER
HEYE
MEEHAN
EISINGER PLLC

## II.    FACTS

**Facts Related to Claims Under 49 U.S.C. § 14706**

7.    On or about July 11, 2018 Williams contracted with QSM for the packing, shipment and delivery of his household goods and furnishings to Richland, Washington from his previous residence in Ashburn, Virginia.

8.    QSM sales representative Christopher Mitchum came to the Ashburn resident in May and July to survey the scope of work and provide an estimate for the shipping services.

9.    On July 11, 2018, QSM confirmed the pick-up date would be August 1, 2018.

10.    Mr. Mitchum represented that with a pick-up date of August 1st, the anticipated delivery would be August 9th or August 10th.

11.    QSM failed to pick-up the items on August 1st which caused a delay in closing for the sale of the home.

12.    QSM failed to deliver the items to Richland, Washington on August 9th or 10th.

13.    On August 14, 2018, Williams called QSM and asked for a status on delivery. QSM provided an estimated date of delivery of August 27, 2018.

14.    The items were not delivered on August 27, 2018.

15.    On August 29, 2018, Williams again called QSM asking where his items were. QSM told Williams that the load was still in Virginia and would be picked up on August 30, 2018 but was unsure when delivery would be completed in light of the Labor Day holiday.

16.    By September 3, 2018, the load still had not left Virginia.

17.    On September 10, 2018, the truck driver for QSM called Williams to tell him that delivery would occur on September 12, 2018.

1333 Columbia Park Trail, Suite 220
Richland, WA 99352
P (509) 735-4444
F (509) 735-7140

WALKER
HEYE
MEEHAN
EISINGER

18.     On September 12, 2018, the truck driver for QSM arrived at the home in Virginia and began unloading some of the items belonging to Williams. The unloading was not completed before the end of the day and the driver for QSM left.

19.     At the time of unloading, Williams noticed damage to several of the items shipped, including shattered mirrors, scratched surfaces and broken legs of furniture.

20.     As set forth below, on September 14, 2018, QSM discontinued delivery and without Williams' knowledge, stored some of Williams' items in a local self-storage facility.

21.     On November 27, 2018, QSM mailed the storage key to Williams.

22.     Upon accessing the self-storage unit, Williams discovered that a significant number of items were missing.

23.     On December 6, 2018, Williams notified QSM that items were missing from unit.

24.     On January 17, 2019, QSM discovered the location of the patio furniture that was not shipped to Williams' home.

25.     On February 14, 2019, the patio furniture arrived at Williams' house.

26.     To date, a substantial number of items remain missing and unlocated, including but not limited to the bottom half of a China cabinet, king-size bed headboard, a dining room table top, and a custom made queen bed frame.

27.     On October 11, 2018, a Notice of Claim in the amount of $57,567.00 was submitted to QSM by first class and certified mail to the registered agent for QSM as set forth in the Virginia Secretary of State's records. A true and correct copy of the Notice of Claim is attached as **Exhibit A**. A true and correct copy of the Declaration of Mailing is attached as **Exhibit B**.

28.     QSM failed to acknowledge the receipt of the claim within as required by 49 CFR § 370.5.

1333 Columbia Park Trail, Suite 220
Richland, WA 99352
P (509) 735-4444
F (509) 735-7140

WALKER
HEYE
MEEHAN
EISINGER

29.    QSM failed to pay, decline, or make a firm compromise settlement offer in writing to the claimant within 120 days after receipt of the claim by the carrier.

**Facts Related to Consumer Protection Act Claim and Intentional Infliction of Emotional Distress Claims**

30.    Upon the delivery of a portion of the items on September 12, 208, Williams provided his credit card to QSM as requested and made payment of $6,100.00 for the transportation of Williams' household goods.

31.    Separate and apart from the delay, loss or damage to shipped property, on September 13, 2018, Rachelue Williams called and made an online complaint with the Better Business Bureau.

32.    The complaint was thereafter posted by the Better Business Bureau to their website.

33.    The same day, president of QSM, Edward Graves, spoke with Williams on the phone and offered a $2,000.00 discount based on poor service. Williams told Graves that the offer didn't even cover the out-of-pocket costs incurred by Williams due to the delay.

34.    Williams produced out-of-pocket receipts totaling $4,117.00 to Graves who indicated he would discount the shipment cost.

35.    On the morning of September 14, 2018, Williams authorized QSM to charge the remaining balance for the shipping. In anticipation of the discount, QSM charged the credit card in the amount of $4,825.00, leaving a remaining balance of $4,117.00.

36.    On September 14, 2018, the second half of the shipment arrived at the Williams' home and began unloading the truck.

37.    On September 14, 2018 Graves demanded that Williams execute a settlement agreement with a non-disclosure and non-disparagement clause and to remove

COMPLAINT FOR DAMAGES - 5

1333 Columbia Park Trail, Suite 220
Richland, WA 99352
P (509) 735-4444
F (509) 735-7110

WALKER
HEYE
MEEHAN
EISINGER PLLC

the complaint filed with the Better Business Bureau. The proposed settlement included a $10,000.00 monetary penalty if the Better Business Bureau complaint could not be removed.

38. When Williams refused to do so, Graves directed the QSM truck driver to discontinue delivery.

39. Williams told Graves that the payment had been made earlier that morning and that he would forgo the discount so that delivery would continue. Graves said he would check with his attorney, but took no action withdraw his previous direction to the driver to discontinue delivery.

40. QSM's driver left Williams house with Williams goods.

41. Despite repeated communications demanding that the goods be returned, QSM refused to respond to any communications whatsoever.

42. On October 10, 2018, QSM responded to the Better Business Bureau falsely alleging that QSM was owed $7,000.00 by Williams for the transportation services.

43. On October 9, 2018, Williams made a complaint to the Washington State Attorney General.

44. On October 19, 2018, QSM responded to the complaint alleging that Williams owed $4,756.66 for the services. A true and correct copy of the response is attached as **Exhibit C**.

45. On October 24, 2018, Williams through counsel replied to the QSM response as set forth in **Exhibit D**.

46. As QSM refused to answer correspondence or calls from Williams, on November 5, 2018, Williams sent a letter and cashier's check in the amount of $4,756.66 to QSM.

1333 Columbia Park Trail, Suite 220
Richland, WA 99352
P (509) 735-4444
F (509) 735-7140

WALKER
HEYE
MEEHAN
EISINGER PLLC
ATTORNEYS

47.     On or about November 19, 2018, Graves contacted counsel for Williams by phone. This was the first contact from QSM to Williams since September 14, 2018. Graves informed counsel that it had received the check, but would not be cashing it because QSM "didn't want to look like ninnies." As the payment was made by cashier's check, Williams gained no benefit from QSM's non-cashing of the payment.

48.     The course of conduct perpetrated by QSM's and Graves, including the intentional withholding of Williams goods because Williams posted a negative online review, is an unfair or deceptive business practice.

49.     The course of conduct perpetrated by QSM's and Graves, including the intentional withholding of goods because Williams posted a negative online review, was extreme and outrageous intended to inflict emotional distress on Williams.

50.     Williams suffered actual severe emotional distress including relapse into depression, requiring resumption of psychiatric consultation and medication, as well as substantial interference with sleep and an increase in anxiety.

## CAUSES OF ACTION

### 49 U.S.C. § 14706- Quality Services Moving

51.     Quality Services Moving is a carrier providing transportation services.

52.     Quality Services Moving failed to timely deliver Williams' goods, damaged Williams' goods and lost Williams' good.

53.     Quality Services Moving is liable to Williams for these actions.

### Consumer Protection Act – Quality Services Moving and Graves

54.     Quality Services Moving and Graves engaged in an unfair or deceptive action in trade or commerce and affecting the public interest by

COMPLAINT FOR DAMAGES - 7

1333 Columbia Park Trail, Suite 220
Richland, WA 99352
P (509) 735-4444
F (509) 735-7140

WALKER
HEYE
MEEHAN
EISINGER

cancelling delivery of the property belonging to Williams when Williams refused to execute a non-disclosure and non-disparagement clause and refused to remove a negative online review. Quality Services Moving and Graves further engaged in unfair and deceptive business practices by providing false responses to complaints made to the Better Business Bureau and the Washington State Attorney General.

**Intentional Infliction of Emotional Distress – Quality Services Moving and Graves**

55.    Quality Services Moving and Graves engaged in extreme and outrageous conduct, with the intent or reckly inflict emotional distress, which actually resulted in severe emotional distress to Williams.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray as follows:

1.    Compensatory damages to be proven at trial;

2.    Treble damages up to $25,000.00, pursuant to RCW 19.86.090;

3.    For an award of attorney fees and costs allowed by law or agreement including those provided under RCW 19.86.090;

4.    For all other relief the court deems just and equitable.

DATED this 19th day of April, 2019.

Bret Uhrich, WSBA #45595
Jillian Harlington, WSBA #48136
Attorneys for Plaintiffs
Walker Heye Meehan & Eisinger, PLLC

COMPLAINT FOR DAMAGES - 8

1333 Columbia Park Trail, Suite 220
Richland, WA 99352
P (509) 735-4444
F (509) 735-7140



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1333 Columbia Park Trail, Ste 220
Richland, WA 99352
Telephone: (509) 735-4444
Fax: (509) 735-7140
E-mail:      *buhrich@walkerheye.com*
             *jharlington@walkerheye.*com

COMPLAINT FOR DAMAGES - 9

1333 Columbia Park Trail, Suite 220
Richland, WA 99352
P (509) 735-4444
F (509) 735-7140

WALKER
HEYE
MEEHAN
EISINGER

# EXHIBIT A

NOTICE OF LIEN CLAIM


NOTICE IS HEREBY GIVEN that the person named below claims a loss pursuant to 49 U.S.C.

§ 14706 and 49 CFR § 370.3.  In support of this claim of loss, the following information is

submitted:

1.      NAME OF CLAIMANT: Greg Williams

2.      FACTS SUFFICIENT TO IDENTIFY BAGGAGE OR SHIPMENT OF PROPERTY:
The items and furnishings picked up from Ashburn, Virginia on August 2nd and August 3rd for
delivery to Richland, Washington with an estimated delivery date of August 17th to August 24th
and with an actual partial delivery date of September 12, 2018 thru September 14, 2018.

3.      ASSERTION OF LIABILITY: QSM failed to deliver goods with the value of $50,750.00
and damage occurring to the good delivered totaling $2,700.00. Additionally, Williams incurred
$4,117.00 in expenses due to the delay in pick-up and shipping of the goods.

4.      CLAIM FOR SPECIFIED OR DETERMINABLE AMOUNT OF MONEY: As detailed
above, the total actual loss arising from carrier's transportation of the goods is $57,567.00.


Dated October 11th, 2018

_____
GREG WILLIAMS, Claimant


Contact information
Bret Uhrich, attorney for Greg Williams
1333 Columbia Park Trail, Ste 220
Richland, WA 99352


NOTICE OF CLAIM OF LOSS  - 1

# EXHIBIT B

DECLARATION OF MAILING

On the 11th day of October, 2018, I served a true copy of:

- *Notice Of Lien Claim*

upon the following by U.S. regular 1st class mail and certified mail return receipt requested to:

> Quality Moving Services, Inc.
> Attn: Vincent A. Tucker, Registered Agent
> 15006 Pine Vista Ln.
> Chester, VA 23831

I certify the foregoing to be true and correct under the penalty of perjury under the laws of the State of Washington.

Executed this 11th day of October, 2018, at Richland, Washington.

*Karol Melde*
Karol Melde

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)      $ _____
☐ Return Receipt (electronic)    $ _____
☐ Certified Mail Restricted Delivery  $ _____
☐ Adult Signature Required       $ _____
☐ Adult Signature Restricted Delivery $ _____

Postmark
Here

10-11-18

Postage
$

Total Postage and Fees
$

Sent To Quality Moving Services, Inc.
Street and Apt. No., or PO Box No. 2006 Pine Vista Ln
City, State, ZIP+4 Chester VA 23831

PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

7017 1070 0000 9220 6774

1333 Columbia Park Trail, Suite 220
Richland, WA 99352
P (509) 735-4444
F (509) 735-7140

WALKER
HEYE
MEEHAN
EISINGER

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Quality Marina Services, Inc.
Vincent A. Tucker, Registered Agent
15006 Pine Vista Ln.
Chester, VA 23831

9590 9402 3231 7196 0819 26

2. Article Number (Transfer from service label)

7017 1070 0000 9220 6774

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X                                    ☐ Agent
                                     ☐ Addressee

B. Received by (Printed Name)        C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ ___ Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☒ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053          Domestic Return Receipt

# EXHIBIT C

**EXHIBIT C**

A

...



**Quality Services Moving**                                    10595 Furnace Road Lorton, VA 22079

October 19, 2018

Attorney General, Washington State
Kristina Winfield
800 5ᵗʰ Ave. Suite 2000
Seattle, WA 98104-3188

RE: Gregory Williams #537539

Dear Ms. Winfield,
We are in receipt of the complaint #537539 filed by Gregory James Williams.

#### Packing and Storage Pick Up

Mr. Williams hired Quality Services Moving for the services of packing her household goods and moving them from his residence in Ashburn, VA into storage with Quality Services Moving in June, 2018. The services for packing and moving these household goods into storage was paid in full at the time the work was completed, June 2, 2018.

On July 28ᵗʰ, 2018, Mr. Williams still had an outstanding balance for his storage being maintained at our facility, $639.17 pro-rated for June and all of July. We did not charge Mr. Williams for storage services provided for the month of August.

#### Packing, Additional Storage Pick Up and Storage Delivery

On July 11, 2018, Mr. Williams scheduled packing of additional household goods, having said packed household goods added to his existing storage account with Quality Services Moving and scheduled to have his entire storage shipment moved from our storage facility to his new residence in Richland, WA. Mr. Williams paid the $200.00 deposit at the time of scheduling these additional services.

Mr. Williams was provided with a binding tariff confirming the cost of delivering his shipment from our storage facility in Lorton, VA to Richland, VA. The binding tariff. A copy of the binding tariff is attached. The amount on the binding tariff is $15,242.49. This is in addition to the storage fees Mr. Williams owed for $639.17.

Mr. Williams did not pay the 40% required prior to his shipment being loaded for transit and delivery. Mr. Williams did not sign the binding tariff because, as he stated in his complaint, he did not agree with the verbiage printed on our industry standard binding tariff form.

After numerous attempts by company owner, Ed Graves to communicate with Mr. Williams address Mr. Williams' concerns with the binding tariff and fees being charged for the services provided by Quality Services Moving, Mr. Williams only paid a total of $10,925.00 at his delivery

($6,100.00 and $4,825.00). Leaving an outstanding balance of $4,117.49 for his binding tariff and an additional $639.17 for his outstanding storage fees.

Given Mr. Williams refusal to pay for his entire balance due at the time of delivery, our driver was informed to cease the completion of delivery, and assembly of furniture. At this time, Mr. Williams remaining household goods, approximately 25% of his shipment is currently in storage and will be released once Mr. Williams pays for the services we've provided.

Mr. Williams has contacted:
The Better Business Bureau
The Attorney General of Washington
The Attorney General of Virginia
The US Department of Transportation of Federal Motor Carrier

Please do not hesitate to let us know if you need additional information.

Sincerely,

Veronica Calixto
Quality Services Moving
veronica@qsmoving.com

**Relocation Intelligence™**



Enclosures:

Move Documents
Binding Tarrif
Waiver of Liability
Valuation Coverage
Invoice



**Bob Ferguson**
# ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000• Seattle, WA 98104-3188• (206) 464-6684

October 9, 2018

Quality Services Moving
10595 Furnace Rd
Lorton, VA 22079

RE:  Gregory James Williams
File #:  537539

Dear Quality Services Moving:

This letter is a courtesy reminder that the requested date for your written response to complaint # 537539 is seven calendar days from the date of this letter. This complaint was filed by Gregory James Williams regarding your business. Our practice is to send a courtesy reminder to provide you with the opportunity to respond in a timely manner.

Please include the file # 537539 with your written response. You may respond by email or United States Postal Service mail. If you have already sent your response, please accept our thanks for your attention to this matter.

If you have questions or would like to submit additional information regarding this complaint, our email address is CRCComplaints@ATG.WA.GOV. Please include the complaint number given above on any complaint correspondence.

Sincerely,

KRISTINA WINFIELD
Consumer Services Coordinator
Consumer Protection Division
1-800-551-4636 for in-state callers
1-206-464-6684 for out-of-state callers

Enclosure

Quality Services Moving Inc.

10595 Furnace Rd # 140
Lorton, VA 22079

# Invoice

| Date | Invoice # |
|------|-----------|
| 10/1/2018 | 76903 |

**Bill To**

Greg Williams
1320 West Gate Way
Richland, WA 99352

| | P.O. No. | Terms | Due Date | BL Number |
|---|----------|-------|----------|-----------|
| | | | 10/1/2018 | |

| Item | Description | Rate | Amount |
|------|-------------|------|--------|
| Moving | Local Moving Services September 2018 - Greg Williams - 16,070 lbs from QSM Storage to 1320 West Gate Way, Richland, WA, 99352, Extra Stop at 21119 Blue Bill Court, Ashburn, VA, 20147 (Additional items added to the existing shipment) | 15,242.49 | 15,242.49 |
| Deposit | Money put down for future service - Paid 7/11/18 as reservation for the pending delivery to WA | -200.00 | -200.00 |
| Release From Dock | Payment required while shipment in transit to WA - Paid 9/12/18 | -6,100.00 | -6,100.00 |
| Down Payment | Partial payment made at the time of delivery, balance still due - Paid 9/14/18 | -4,825.00 | -4,825.00 |
| Storage | Storage fees. Period: June 2018 5 crates @ $60 ea/mo + 1 O/S @ $25 ea/mo Pro-rated: 06/02/18 - 06/30/18 | 314.17 | 314.17 |
| Storage | Storage fees. Period: July 2018 | 325.00 | 325.00 |

| | |
|---|---|
| **Total** | $4,756.66 |
| **Balance Due** | $4,756.66 |

| Phone # |
|---------|
| 703-495-8900 |

# Greg Williams
## Estimate/Order for Service
### Pricing Option: Rerate Tariff

**Agency Name:**
Quality Services Moving
10595 Furnace Rd Ste 140

**Carrier Name:**
Quality Services Moving
10595 Furnace Rd Ste 140

---

**Tariff & Rating Information**

| | | |
|---|---|---|
| Orig Zip 22079 | H.H.G. Tariff QSM 100 | DOE Price / FS% 2.79 / 6.00% |
| Orig SA 168-Washington, DC | Rating Eff Date 08/30/18 | Valuation Option .60/lb |
| Dest Zip 99352 | Loading Date | Valuation Amount .00 |
| Dest SA 836-Richland, WA | Transp Weight 16070 | Valuation Deduct .00 |
| Transp Discount 63.00% | S.I.T. Discount 63.00% | |
| Pk/Unpack Discount 63.00% | Other Discounts 63.00% | |

---

**Routing Information**

        220-Origin (Sch 3)
        220-Orig Stopoff (Sch 3)
        993-Destination (Sch 3)

**Charge Breakdown**

| Description | qnty | wght | rate | total |
|---|---|---|---|---|
| Transp Charge (Peak) | | 16070 | | 13252.05 |
| Fuel Surcharge 6% | | | | 795.12 |
| Item 60 IRR  4% | | | | 530.08 |
| Item 135 Fee(orig) | | 16070 | 2.39 | 384.70 |
| 1st Stopoff (orig)@ Zip: 220 | 50.00 | | 55.19 | 55.19 |
| Item 135 Fee(dest) | | 16070 | 1.40 | 225.35 |
| Item 53 Declaration of Value | | | | |
| Basic Coverage (.60 per lb) | | 0.00 | | 0.00 |
| FVP (min value 100,000) 1.   0 Deductible | | 792.00 | | |
| 2. 250 Deductible | | 582.00 | | |
| 3. 500 Deductible | | 453.00 | | |

                                                    ==========
            Total Charges                            15242.49

Total Tariff Charges  41195.90          Total Charges  15242.49
Discount Amount       25953.41

Any Fuel Surcharge is determined by applicable DOE price and is subject to change.

---

Final charges calculated for your shipment, based on actual weight and services, will be
those appearing in this Carrier's tariffs applicable to the transportation. These final
charges may exceed the approximate costs appearing in your estimate. This estimate is not
binding upon this carrier and the charges shown are the approximate charges to be assessed
for the services identified in this estimate. You may not be required to pay more than 110
percent of the non-binding estimate at the time of delivery. All charges to be paid in U.S.
funds by cash, postal money order, cashier's or approved personal check payable to this
carrier, American Express, Discover, MasterCard or Visa charge cards.

NOTE TO CUSTOMER: Packing containers and materials are your property. The unpacking service
includes removal of these items unless you direct otherwise. An additional charge will be
accessed for the disposal of packing materials from items unpacked by Shipper or carrier
on a date other than at delivery time.

This shipment is subject to minimum of weight _____ charges _____.

---

SHIPPER REQUESTS NOTIFICATION OF ACTUAL WEIGHT/CHARGES: YES__ NO__

---

In the event additional services are required and provided the cost of these will be in addition to the amount stated above.  Such services and applicable charges will be based upon the Tariff rates in effect on the date of this service.

1. All charges are to be paid in U.S. funds via cash, cashier's check, or postal money order.
2. I understand that the terms of this estimate and all services to be provided are subject to this Carriers tariffs incorporated by this reference and available for inspection this Carriers general offices.
3. I acknowledge receipt of a copy of this Estimate / Order for service.
4. I have been advised of my right to observe the weighing of my shipment and informed of the scale to be used.  ___ I do ___ do not desire to observe the weighing.
5. I have received a copy of Publication OCE-100 "Your Rights and Responsibilities When You Move," and a summary of this Carriers Dispute Settlement Program.

---

**WARNING:**
If a moving company loses or damages your goods, there are 2 different standards for the company's liability based on the types of rates you pay. **BY FEDERAL LAW, THIS FORM MUST CONTAIN A FILLED-IN ESTIMATE OF THE COST OF A MOVE FOR WHICH THE MOVING COMPANY IS LIABLE FOR THE FULL (REPLACEMENT) VALUE OF YOUR GOODS** in the event of loss of, or damage to, the goods. This form may also contain an estimate of the cost of a move in which the moving company is liable for **FAR LESS**  than the replacement value of your goods, typically at a lower cost to you. You will select the liability level later, on the bill of lading (contract) for your move. Before selecting a liability level, please read "Your Rights and Responsibilities When You Move," provided by the moving company, and seek further information at the government website **www.protectyourmove.gov.**

---

Quality Services Moving , by signature, agrees to provide the services outlined above.

_____ By _____   _____
Agt#          Representative              Customer or Customer's Representative Date

(v.2.2.6)

 

 Quality Services Moving & Delivery          P.O. Box 116, Newington, VA 22122

| Waiver of Liability |
| --- |

Date: _____

Shipper's Name: _____

Address: _____

City, State, Zip: _____


Crew Leader: _____

Crew: _____

Nature of Situation: _____

_____

_____

_____

I, _Rochelle G Wood_ hereby release Quality Services Moving and all of its employees from any and all claims for damage resulting from the above mentioned Nature of Situation. The situation is outside of the prudent and safe normalities of the industry. Specifically, this includes any damage/soiling of the interior carpeting, flooring, walls, or any openings to a residence or business. The waiver also applies to the specific furniture being moved. There may or may not be other options in achieving the desired end result, but the client understands that Quality Services Moving accepts no responsibility due to the improbability of the task's successful outcome.

Customer Signature: _Rochelle Wood_

Date: _6/1/2018_

(703) 495 8900 Local • (703) 495 8902 FAX • 1 888 776 6846 Outside Washington Metro Area



*Quality Services Moving*

*P.O. Box 116 Newington, VA 22122*

# LOCAL MOVE VALUATION OPTIONS

At Quality Services Moving, our professional movers are trained to take every possible precaution with your possessions. We have years of experience ensuring that every item is safe and secure during shipment. To protect against the rare occasion of damage, we offer two Valuation Protection Plans. These protection plans are NOT insurance and the coverage they provide is NOT underwritten by an insurance company.

*Unless waived in writing, your shipment will be protected with Full Replacement Value.*

*Option 1:* Full Replacement Value. This is the most comprehensive option available to protect your belongings. By choosing Full Replacement Value, Quality Services Moving will, at our option, either repair, replace, or offer cash settlement for any item that is damaged, destroyed or lost. If an item is repaired, it will be restored to the same or similar condition and appearance as it was prior to shipment. Quality Services Moving may also opt to replace an item with one of like kind and quality, or pay you for the cost of the repair or replacement. There are additional premium costs and deductible choices for Full Replacement Value coverage, and you must declare an amount equal to at least $6.00/lb times the weight of your shipment. It is important to note that customers waiving Full Replacement Value in writing prior to the move commencing cannot later elect to purchase Full Replacement Value during the process of the move or after it is completed.

| Estimated Weight (In Pounds) | Maximum Valuation (In Dollars) | Option A $100 Deductible | Option B $250 Deductible | Option C $500 Deductible |
|---|---|---|---|---|
| 3000 | $18,000 | $199.20 | $159.60 | $105.60 |
| 4000 | $24,000 | $259.20 | $207.60 | $135.60 |
| 5000 | $30,000 | $321.60 | $256.80 | $165.60 |
| 6000 | $36,000 | $381.60 | $303.60 | $195.60 |
| 7000 | $42,000 | $444.00 | $352.80 | $225.60 |
| 8000 | $48,000 | $504.00 | $400.80 | $255.60 |
| 9000 | $54,000 | $566.40 | $448.80 | $285.60 |
| 10000 | $60,000 | $626.40 | $496.80 | $315.60 |
| 11000 | $66,000 | $688.80 | $546.00 | $345.60 |
| 12000 | $72,000 | $748.80 | $592.80 | $375.60 |
| 13000 | $78,000 | $811.20 | $642.00 | $405.60 |
| 14000 | $84,000 | $871.20 | $690.00 | $435.60 |
| 15000 | $90,000 | $933.60 | $739.20 | $465.60 |
| 17000 | $102,000 | $1,056.00 | $835.20 | $525.60 |
| 19000 | $114,000 | $1,178.40 | $931.20 | $585.60 |

Shipment Valuation:      $_____

Deductible Option:      A      B      C

Valuation Charge*:      $_____

Shipper Name: _____

Shipper Signature: _____

Date Signed: _____

Crew Leader: _____

\* If Full Replacement Value coverage is retained, then payment is due at the time of the move. If you do not remit payment for the Full Replacement Value option chosen above, you waive your rights to Full Replacement Value protection and any claims filed will be settled using the Released Value option described below.

*Option 2:* Released Value. This is the industry standard of minimum protection afforded by all moving companies, at no cost to you. Quality Services Moving therefore also offers this option, upon your waiver of Full Replacement Value. With this option, your coverage is limited to 60 cents per pound, per article, with a maximum sum of 60 cents per pound multiplied by the weight of your entire shipment. Loss or damage claims under this option are settled based on the weight (in pounds) of the article. It is important to note that failure to pay the appropriate premium for Full Replacement Value, should you wish to retain it, will result in claims being settled according to Released Value Option.

*Example:*     If a dresser weighing 100 pounds and valued at $1,000.00 is damaged, the carrier's maximum liability would be $60.00 (100 lbs. x $0.60/lb. = $60.00 carrier's maximum liability)

Shipment Weight: _____ X $0.60/lb. = _____ Carrier's Maximum Liability

Shipper Name: _____

Shipper's Signature: _____

Date Signed: _____

Crew Leader: _____



**Quality Services Moving & Delivery**          P.O. Box 116, Newington, VA 22122

## Storage Account & Credit Card Authorization

Customer Name: _____   Company (if app): _____

Home Phone #: _____   Work Phone #: _____

Cell Phone #: _____   E-mail Address: _____

**Select Payment Method Below**

**Option 1: Automatic Payment via ACH Debit** (MUST INCLUDE A VOIDED CHECK; NO ADD'L FEES)

Financial Institution Name: _____

Institution Address: _____

_____   _____   Account Type: __Checking __Savings

Account Number          Routing Number

**Option 2: Automatic Payment via Credit Card** (5% SURCHARGE ASSESSED PER TRANSACTION)

VISA          MASTERCARD          AMEX          DISC

Card #: _____                    Exp. Date: _____

Name on Card: _____             Card Verification _____

Card Billing Address: _____

City, State Zip _____

**Option 3: Monthly Invoice** (10% Late Fee Assessed on Payments Received After the 10th of the Month)

Name _____

Mailing Address _____

City, State Zip _____

( ) I (we) hereby authorize Quality Services Moving, herein called COMPANY, to initiate debit entries to my (our) account indicated below and the financial institution named below, hereinafter called FINANCIAL INSTITUTION, to debit the same to such account for moving and storage charges. I (we) acknowledge that the origination of ACH transactions to my (our) account must comply with the provisions of U.S. law [Option 1]. ( ) I agree to have applicable storage fees incurred with Quality Services Moving charged to the credit card indicated above [Option 2], or to receive an invoice mailed to the address specified [Option 3].

X _Fortulaee () Welley_

Payer Signature

The Acceptable acknowledgement terms and conditions that govern the acceptable terms and conditions as they apply to each of the services provided or to be provided is subject to the right acknowledgement of applicable storage fees incurred with Quality Services Moving.

(703) 495 8900 Local • (703) 495 8902 FAX • 1 888 776 6846 Outside Washington Metro Area



# Quality Services Moving & b LIVERY

**703-495-8900   1-888-776-6846   www.qsmoving.com**

**Job Name:** Williams, Greg

6/1/2018

Move Dispatch

| Trucks | | Crew | | Extra Equipment | | Required | | Box Pull | |
|---|---|---|---|---|---|---|---|---|---|
| | | Drivers: | | Lon-Bin: | | 2-Wheels: | | Ward Buy: | 0 |
| Straight Trk: | | Loaders | | Rfrg. Dolly: | | 4-Wheels: | | Ward Rnt: | |
| Vans: | | Helpers: | | Monster-4: | | Tool Box: | | Ward Free: | |
| Tractor Trl's: | | | | Piano Board: | | Door Jams: | | 5.2 Dish: | 0 |
| | | | | Comp Crt: | | Stretch Wrap: | | 4.5 Lg: | 0 |
| | | | | Panel Bars: | | Floor Runner: | | 3.1 Md: | 0 |
| | | | | Inv. Stickers: | | | | 2.5 Ofc: | 0 |
| | | | | Inv. Sheets: | | | | 1.5 Sm: | 0 |
| | | | | | | | | Mat K/Q: | 0 |
| | | | | | | | | Mat T/F: | 0 |
| | | | | | | | | Crib: | 0 |
| | | | | | | | | Mirror: | 0 |
| | | | | | | | | Lamp: | 0 |

| Estimated Weight | Surveyed Weight | Required Delivery Date |
|---|---|---|
| | 8312 | |

## Crating

| Crated Item | Length | Width | Height | Crating Instructions |
|---|---|---|---|---|

## Packing Notes

Packing is charged per box packed, plus flat $150 travel fee for 3 packers Final packing charges determined by actual boxes packed plus flat travel fee. Packing estimate as surveyed, including travel fee, is =$830.50, included in total estimate
Move rate is 4 men @ $260/hr pls flat $260 travel fee, a flat $20 fuel surcharge and flat $95 warehouse handling fee. Estimated 7 hour's total labor pls travel fees, fuel and warehouse fee=$2195, included in total estimate.

## Load Notes /Unload- Customer Concerns - Requests

Mostly packed by customer. House being staged prior to sale.
Move rate is 4 men @ $260/hr pls flat $260 travel fee, a flat $20 fuel surcharge and flat $95 warehouse handling fee.
Estimated 7 hour's total labor pls travel fees, fuel and warehouse fee=$2195, included in total estimate.
Storage is estimated at 8 x $60 per crate/month=$480.00/month, pro-rated daily, not included in total estimate.
Estimate includes truck(s), crew, fuel, mileage, equipment, moving pads, stretch wrap, home protection measures, disassembly/reassembly of bed frames, furniture and box placement at destination, inventories, and $.60/lb. per article released value valuation. Premiums/deductibles for full replacement valuation can be found on the Valuation Option Form, Option 1 table, using 8312 lbs.

## Special Customer Requests

Estimate based on 8312 lbs coming into QSM Storage.
Packing is charged per box packed, plus flat $150 travel fee for 3 packers Final packing charges determined by actual boxes packed plus flat travel fee. Packing estimate as surveyed, including travel fee, is =$830.50, included in total estimate
Move rate is 4 men @ $260/hr pls flat $260 travel fee, a flat $20 fuel surcharge and flat $95 warehouse handling fee. Estimated 7 hour's total labor pls travel fees, fuel and warehouse fee=$2195, included in total estimate.
Storage is estimated at 8 x $60 per crate/each/month=$480.00/month, pro-rated daily, not included in total estimate
Estimate includes truck(s), crew, fuel, mileage, equipment, moving pads, stretch wrap, home protection measures, disassembly/reassembly of bed frames, furniture and box placement at destination, inventories, and $.60/lb. per article released value valuation. Premiums/deductibles for full replacement valuation can be found on the Valuation Option Form, Option 1 table, using 8312 lbs.

## Billing/ Payment



# Quality Services Moving DELIVERY

**703-495-8900    1-888-776-6846    www.qsmoving.com**

**Job Name:** Williams, Greg( Storage Delivery)

Denise Longo
(703) 509-4200

8/2/2018

| Trucks | | Crew | | Extra Equipment | | Required | | Box Pull | |
|---|---|---|---|---|---|---|---|---|---|
| | | Drivers: | | Com-Bin: | | 2-Wheels: | | Ward Buy: | 0 |
| Straight Trk: | | Loaders: | | Rfrg. Dolly: | | 4-Wheels: | | Ward Rnt: | |
| Vans: | | Helpers: | | Monster-4: | | Tool Box: | | Ward Free: | |
| Tractor TH's: | | | | Plano Board: | | Door Jams: | | 5.2 Dish: | 0 |
| | | | | Comp Crt: | | Stretch Wrap: | | 4.5 Lg: | 0 |
| | | | | Panel Bars: | | Floor Runner: | | 3.1 Md: | 0 |
| | | | | Inv. Stickers: | | | | 2.5 Ofc: | 0 |
| | | | | Inv. Sheets: | | | | 1.5 Sm: | 0 |
| | | | | | | | | Mat K/Q: | 0 |
| | | | | | | | | Mat T/F: | 0 |
| | | | | | | | | Crib: | 0 |
| | | | | | | | | Mirror: | 0 |
| | | | | | | | | Lamp: | 0 |

| Estimated Weight | Surveyed Weight | Required Delivery Date |
|---|---|---|
| 11,896 | 11896 | |

## Crating

| Crated Item | Length | Width | Height | Crating Instructions |
|---|---|---|---|---|
| | | | | |

## Packing Notes

Bring 4 mirror cartons, 1- Floor lamp box, 1-Wardrobe Box.

## Load Notes /Unload- Customer Concerns - Requests

Estimate based on 11896 lbs.( 5 crates out of QSM storage and  a pick up in Ashburn) to Richland WA With a 5 -10 day delivery spread. Relocation is by weight and Federal Tariff. Federal Tariff for 11896 lbs. is $12937.49 . Final binding Tariff determined by final weight, customer may view weighing of shipment in Lorton, VA. Estimate includes truck(s), crew, fuel, mileage, equipment, moving pads, stretch wrap, home protection measures, disassembly/reassembly of bed frames, furniture and box placement at destination, inventories, and $.60/lb. per article released value valuation. Premiums/deductibles for full replacement valuation can be found on the Federal Tariff, page 1.

## Special Customer Requests

Customer has 1-800 Junk coming in the afternoon to clean up after we move out remaining goods, so important we arrive on time.
Estimate based on 11896lbs.( 5 crates out of QSM storage and  a pick up in Ashburn) to Richland WA With a 5 -10 day delivery spread. Relocation is by weight and Federal Tariff. Federal Tariff for 11896 lbs. is $12937.49 . Final binding Tariff determined by final weight, customer may view weighing of shipment in Lorton, VA. Estimate includes truck(s), crew, fuel, mileage, equipment, moving pads, stretch wrap, home protection measures, disassembly/reassembly of bed frames, furniture and box placement at destination, inventories, and $.60/lb. per article released value valuation. Premiums/deductibles for full replacement valuation can be found on the Federal Tariff, page 1.

## Billing/ Payment

AS OF 7/28/18, CUSTOMER OWES $639.17 FOR PRO-RATED JUNE AND ALL OF JULY STORAGE.  PLEASE COLLECT PRIOR TO DELIVERY!
200.00

# EXHIBIT D



WALKER
HEYE
MEEHAN
EISINGER PLLC

Bret Uhrich
buhrich@walkerheye.com
Direct 509.537.1204

Marissa Davison
Legal Assistant
mdavison@walkerheye.com
Direct 509.537.1213

October 24, 2018

*Sent via email and first class mail*

Kristina Winfield
800 5th Ave., Ste 2000
Seattle, WA 98104
*CRCComplaints@ATG.WA.GOV*

Re:    Gregory Williams – File 537539 – Response to Letter from Quality Moving Services

Dear Ms. Winfield:

I am the attorney for Gregory Williams, and this is the reply to the letter submitted October 19, 2018 by Quality Moving Services in response to the complaint filed by my client. The response from Quality Moving Services is wholly inconsistent with our previous communications with the company.

While Mr. Williams has substantial complaints about the delays in the pick-up and delivery of his items to his home, the damages done in transit, and the repeated broken promises by Quality Moving Services, this is not the primary basis for his complaint to the Consumer Protection Division. The primary complaint is the outrageous conduct of Quality Moving Services and its President, Ed Graves, when it drove away with Mr. Williams' property after he refused to sign a settlement agreement with a non-disparagement clause which required him to remove a complaint posted online with the Better Business Bureau.

**Timeline**

Greg Williams hired Quality Moving Services to pack and move his household goods and furnishings from his home in Virginia to his new home in Richland, Washington. Back in July of 2018, Christopher Mitchum of Quality Moving Services confirmed that the company would be picking up the items at Mr. Williams' home in Virginia on August 1, 2018 and that the items would be delivered to Richland, Washington on August 9th or 10th. Quality Moving Services did not pick up the items as scheduled, and it was not until after August 3rd that the items were fully packed and removed from the Virginia home. This delay caused a delay in the closing of the sale of the Virginia home and the purchase of the Washington home.

Walker Heye Meehan & Eisinger, PLLC

- 2 -

After multiple unexplained delays, Mr. Williams' items arrived at the Richland house on September 12, 2018. Quality Moving Services did not schedule a crew to unload the items, leaving the driver to begin unloading the items himself. The driver was unable to complete the unloading and left at the end of the day. Mr. Williams sent Quality Moving Services the enclosed timeline detailing the delays and repeated broken promises of Quality Moving Services on September 12, 2018.

On September 13, 2018, no unloading took place. Ed Graves calls Mr. Williams and offered a $2,000.00 discount, which did not even cover the direct out-of-pocket costs incurred by the delay. Mr. Graves asked for proof of the costs, and Mr. Williams sent Mr. Graves receipts totaling $4,117.00 in travel and lodging expenses. The same day, Rachelue Williams filed a complaint with the Better Business Bureau. At the end of the day, Mr. Graves sent Mr. Williams an email with a proposed release, together with the following correspondence:

> Mr. Williams,
>
> I have read the word document that you previously sent us. In order for us to give you the discount that you are asking for in its entirety. We must have the enclosed Mutual release signed by you and your wife. After signing, you can send us a picture of the signature page and give the original signatures to Angel. This will allow you to take the entire $4117 credit that you asked for. The remaining balance after your requested discount is $4825.
>
> As I stated on the phone, we apologize for the late delivery of your household goods. We absolutely wanted to have your goods to you within the delivery window. We feel terrible that it took so long to get your things to Richland, WA.

Note that nothing in the proposed settlement agreement from Quality Moving Services makes any claim or reference to storage fees.[a] On September 14, 2018 Mr. Williams hired me to review the proposed settlement agreement. That morning, Mr. Williams spoke with Andy Graves (who is understood to be the brother of Ed Graves) and authorized Quality Moving Services to charge his credit card $4,825.00 anticipating the transaction would be final payment based on the settlement agreement. Quality Moving Services arrived at the Williams home and began unloading the remaining goods. At 9:57 a.m. I sent Mr. Graves the settlement agreement I drafted and which had been approved by Mr. Williams.

After receiving the settlement agreement, Quality Moving Services employee Veronica Landry-Calixto sent Mr. Graves an e-mail notifying him of the complaint Mrs. Williams had sent to the Better Business Bureau the previous day. Mr. Graves sent Mr. Williams the following e-mail:

---

[a] Mr. Williams provided his credit card information to Christopher Mitchum to pay the storage fees when the initial services began being performed in July, 2018. It was not until the response letter that Mr. Williams became aware that the charge was never made.

Walker Heye Meehan & Eisinger, PLLC
- 3 -

Mr. Williams,

This will have to be taken down per our pending agreement.  I will also insist on a monetary penalty within the agreement in the event of a breach now that I see what is being done on your side behind the scenes.

Ed Graves

Approximately three hours later, Mr. Graves sent the proposed redline changes to the settlement agreement I sent to Mr. Graves earlier that morning. Most importantly, Mr. Graves demanded that Mr. Williams have the complaint removed from the Better Business Bureau's website and required payment of $10,000.00 if Mr. Williams was unable to do so. In response, I sent Mr. Graves the following e-mail:

I would recommend that all proposed changes be rejected. Williams doesn't have any ability to get negative comments removed from third-party websites beyond requesting they be removed and the website voluntarily complying. Williams isn't going to go to Virginia to resolve any dispute. Absent an agreement to the contrary proper venue and law is almost assuredly Washington.

Mr. Graves responded as follows:

With the existence of 1 negative review already written then the point of the agreement is moot isn't it?  Williams is already displaying a disregard for the spirit and letter of the agreement.

The AMSA arbitration program does not require anyone to travel anywhere which is why it is the best option should arbitration be necessary.

The venue is set to VA because at the time the contract was ratified, The Williams were residents of VA, entering into a contract with a VA corporation.  For work that originated In VA.  Additionally, the tariff that Quality has on file with the Federal Highway Administration already lists Virginia as the venue.  Making the inclusion of WA in this proposed agreement moot.

We can reject the changes all day long.  That doesn't move the issue to resolution. In the absence of any agreement, Quality will charge full price for the relocation services, take our chances with the reviews and enjoy the protections that the Carmack amendment provides.  But I don't think that's what either party wants.

Ed

Immediately after sending the e-mail, Mr. Graves called the driver and told him to discontinue the delivery. The driver left the residence with Mr. Williams' items still in the truck. Mr.

Walker Heye Meehan & Eisinger, PLLC
- 4 -

Williams called Mr. Graves and demanded that he return his items to the house. Mr. Williams told Mr. Graves of the payment made earlier that morning and that Quality Moving Services was authorized to charge the remaining balance. Mr. Graves said he would "consult with his attorney." This was the last time anyone with Quality Moving Services has contacted Mr. Williams or counsel. Repeated correspondence has been sent and has been unanswered.

**Materials in Response to Consumer Complaint:**

The invoice dated October 1, 2018 which is attached to the response to the complaint is fraudulent. It has never been sent to Mr. Williams and has been created after-the-fact for the response submitted by Quality Moving Services. The most obvious evidence of this is the response that Quality Moving Services sent to the Better Business Bureau on October 10, 2018 which stated as follows:

> MESSAGE FROM BUSINESS:
>
> Dear Sirs:
>
> We are seeking legal action again complaint as this customer owes our company $7,000.00 for services rendered. We will provide the BBB with an update once the legal proceedings have been completed and final determination is made by the court regarding this matter.
>
> Thank you

If Quality Moving Services had actually generated an invoice on October 1, 2018 and sent it to my client, it would know the amount allegedly due and owing. As noted above, my client authorized payment in full on September 14, 2018. Quality Moving Services has chosen not to make the charge in an attempt to justify its outrageous conduct of stealing Mr. Williams' items because his wife posted a complaint to the Better Business Bureau website.

To date, Quality Moving Services remains in possession of $57,567.00 of Mr. Williams' goods and furnishings as detailed in the enclosed. While the company claims to be holding 25% of Mr. Williams' items, the reality is different. The Williams' delivered possessions include half a bed frame, half of a sectional couch, half of a china cabinet, a large bookcase with no shelves, a desk with no drawers, a dining room table top with no legs, a chival mirror with no stand, etc.

**Legal Analysis**

The Washington legislature enacted the Consumer Protection Act (hereafter "CPA"), RCW 19.86 *et. seq*, for the purpose of protecting Washington citizens from unfair or deceptive trade practices. *Dwyer v. J.I. Kislak Mortg. Corp.*, 103 Wn. App. 542, 547-58, 13 P.3d 240 (2000). The CPA is intended to "compliment the body of federal law governing restraints of trade, unfair competition and unfair, deceptive and fraudulent acts and practices in order to protect the public

Walker Heye Meehan & Eisinger, PLLC
- 5 -

and foster fair and honest competition." *Panag v. Farmers Ins. Co. of Washington*, 166 Wn.2d 27, 37, 204 P.3d 885 (2009). The statute declares that "unfair or deceptive acts or practices in… trade or commerce" are unlawful. RCW 19.86.020.

The scope of the CPA is expansive. "A central purpose of the CPA is to provide an efficient and effective method of filling the gaps in common law and statutes." *Panag*, 155 Wn.2d at 54. "The CPA is a carefully drafted attempt to bring within its reach *every* person who conducts unfair or deceptive acts or practices in *any* trade or commerce" *Holiday Resort*, 134 Wn. App. at 220 (emphasis in original). The statute is to be "liberally construed" so that "its beneficial purposes may be served." *Id.* at 220 (*citing Short v. Demopolis*, 103 Wn.2d 52, 61, 691 P.2d 163 (1984)).

Under the CPA, whether the defendants engaged in an "unfair or deceptive act or practice" may be predicated on: (1) a per se violation of statute; (2) an act or practice that has the capacity to deceive a substantial portion of the public; or (3) an unfair or deceptive act not regulated by statute that is in violation of the public interest. *Mellon v. Regional Trustee Services Corp.*, 182 Wn. App. 476, 488, 334 P.3d 1120 (2014) (*citing Klem v. Wash. Mut. Bank*, 176 Wn.2d 771, 787, 295 P.3d 11789 (2013)). Neither "unfair" nor "deceptive" are defined under the CPA. *Klem*, 176 Wn.2d at 784. "By broadly prohibiting 'unfair or deceptive acts or practices in the conduct of any trade or commerce,' RCW 19.86.020, the legislature intended to provide sufficient flexibility to reach unfair or deceptive conduct that inventively evades regulation." *Panag*, 166 Wn.2d at 49. As a result, the courts of this state have "allowed the definitions (of 'unfair' or 'deceptive') to evolve through a gradual process of judicial inclusion and exclusion." *Klem*, 176 Wn.2d at 784. In deciding whether a practice or act is unfair or deceptive, the court looks to federal court decisions that have approved or rejected administrative determinations made by the Federal Trade Commission ("FTC") as guiding, but not binding, authority. *Panag*, 166 Wn.2d at 47 (*citing* RCW 19.86.920). Whether a particular act or practice is "unfair or deceptive" is a question of law. *Panag*, 166 Wn.2d at 47.

An act or practice in trade or commerce is "deceptive" if it has the capacity to deceive a substantial portion of the public. *Dwyer*, 103 Wn. App. at 547. "Neither intent to deceive nor actual deception is required." *Id.* Rather, a plaintiff must show that the act in question "had a capacity to deceive a substantial portion of the public." *Panag*, 166 Wn.2d at 47. "Implicit in the definition of 'deceptive' under the CPA is the understanding that the practice misled or misrepresents something of material importance." *Holiday Resort*, 134 Wn. App. at 226. "Deception exists if there a representation, omission or practice that is likely to mislead a reasonable consumer." *Panag*, 166 Wn.2d at 50.
In *Panag*, the Court addressed whether collection notices sent by an insurer to uninsured motorists to recover subrogation were deceptive under the CPA. *Panag*, 166 Wn.2d at 50. The notices listed an amount due and were billed in such a way as to give the impression that the billed amount was a liquidated debt rather than a potential tort claim that is subject to dispute. *Id.* at 35. Even though the collection notices contained accurate information, the net impression was likely to mislead because the ordinary consumer would not understand the meaning of a "subrogation claim" and the notices gave the impression that there was no alternative to

Walker Heye Meehan & Eisinger, PLLC
- 6 -

payment. *Id*. at 50. As a result, the Court held that the collection notices were deceptive and the Court of Appeals reversal of the trial court's order granting summary judgment was affirmed. *Id*. at 65.

Similarly, in *Dwyer v. J.I. Kislak Mortg. Co.*, 103 Wn. App 542, 547, 13 P.3d 240 (2000), the Court held that a mortgage company's practice of including miscellaneous services charges along with secured sums on its mortgage payoff statement constituted a deceptive act in violation of the CPA. The payoff statement included fax fees and miscellaneous service charges which did not have to be paid to pay off the balance of the loan and to reconvey title. *Id*. Because the plaintiffs requested a payoff amount, it was reasonable for them to assume that the statement only contained those amounts required to pay off the mortgage, and that any other fees would be specifically identified as extraneous charges that were not connected to releasing the mortgage. *Id*. As such, the Court held that the payoff statements were deceptive as a matter of law and reversed the trial court's grant of summary judgment. *Id*. at 547-48.

An act or practice in trade or commerce may be "unfair" even if not deceptive. *Klem*, 176 Wn.2d at 787 (2013). "The universe of 'unfair' business practices is broader than, and encompasses, the universe of 'deceptive' business practices." *Panag*, 166 Wn.2d at 51. "Business practices that are 'deceptive' are, *ipso facto*, 'unfair.'" *Id*.

> Our Supreme Court suggested that a defendant's act or practice might be "unfair" if it "causes or is likely to cause substantial injury to consumers which is not reasonable avoidable by consumers themselves and is not outweighed by countervailing benefits.

*Mellon*, 182 Wn. App. at 489-90 (*quoting Klem*, 176 Wn.2d at 787). In addition, a defendant's act or practice might be "unfair" if it "offends public policy as established by statutes or the common law or is unethical, oppressive, or unscrupulous." *Klem*, 176 Wn.2d at 786; *Mellon*, 182 Wn. App. at 490.

As applied to the case at hand, the actions of Mr. Graves and Quality Moving Services are the definition of an unfair and deceptive business practice. When Mr. Williams refused to sign the settlement agreement that Quality Moving Services desired, Mr. Graves directed his employee to discontinue the delivery and to steal Mr. Williams' goods and furnishings in an attempt to force him to sign the agreement. The company then refused to accept payment in order to fabricate a claim the Mr. Williams had not paid for the services. Quality Moving Services then took the additional step of creating a fraudulent invoice which was never sent to Mr. Williams to your office which was inconsistent with both the settlement agreement drafted by Quality Moving Services and the response the company provided to the Better Business Bureau alleging that Mr. Williams owed $7,000.00.

Walker Heye Meehan & Eisinger, PLLC
- 7 -

**Conclusion**

Mr. Williams requests that the Attorney General use all powers allowed under the Consumer Protection Act to pursue Quality Moving Services and Ed Graves for their gross misconduct. These sorts of business practices have no business occurring in our State. As a result of these actions Mr. Williams and his wife have been deprived of their property for more than two months, sleeping on makeshift beds in a half-furnished house. All because Quality Moving Services did not appreciate a complaint to the Better Business Bureau exposing the poor quality of their business services.

Sincerely,

BRET UHRICH

BU/bju
10175.01

cc:     Client, via email
        Marcia Tilghman, mtilghman@mybbb.org
Enclosures

| | |
|---|---|
| July 11, 2018 | Confirmation E-mail |
| September 12, 2018 | Timeline and Timeline E-mail |
| September 13, 2018 | Ed Graves E-Mail. |
| September 13, 2018 | Proposed Settlement Agreement from Quality Moving Services. |
| September 14, 2018 | Proposed Settlement Agreement from Greg Williams |
| September 14, 2018 | Ed Graves E-mail |
| September 14, 2018 | Bret Uhrich E-mail |
| September 14, 2018 | Ed Graves Response E-mail |
| September 14, 2018 | Greg Williams E-mail |
| October 9, 2018 | Inventory of items missing |
| October 10, 2018 | Quality Moving Service's Response to BBB Complaint |

---------- Forwarded message ---------
From: **Administrator System** <Administrator@qsmoving.com>
Date: Wed, Jul 11, 2018 at 10:05 AM
Subject: Customer Deposit Method
To: Williams Greg <gonasadaddy@gmail.com>

HOME | STORAGE & PACKING | INTERNATIONAL | ABOUT

Dear Greg,

This e-mail confirms that Quality Services Moving has entered your deposit information received via Credit Card*. This deposit is used to reserve service dates and resources to book your upcoming move. If your move has multiple service dates, then the deposit will be applied on the last day services are performed.

*Refund Cancellation Policy:*
*Cancellation notices must be in writing and must be received by Quality Services Moving at least seven (7) calendar days prior to your scheduled move date and time for a full deposit refund. If less than 7 calendar days' notice is received then the deposit will either be forfeited or you may choose to receive a credit in the amount of your deposit to be applied towards future moving services with Quality Services Moving.*

Please call (703) 495-8900 Option 1 with any questions, concerns, or changes regarding your upcoming move. We thank you for your business and we look forward to providing you with an exceptional relocation experience!

Sincerely,
Christopher Mitcham

*NOTE:
If the deposit method is rejected by your financial institution, then your move is not considered "booked" and this notice is null and void.

MOVING | ABOUT | REVIEWS | PHOTO GALLERY | BLOG | CONTACT

©2016 Quality Services Moving. All Rights Reserved.
Quality Services Moving | 10595 Furnace Road Suite 140, Lorton, VA 22079 | 703.495.8900 |
This communication is confidential and may contain customer information intended only for the proposed recipient. Please notify the sender and delete this message if you think this email was sent inadvertently by mistake or if you are not the proposed recipient. Unauthorized disclosure or distribution of this information is strictly prohibited.

---------- Forwarded message ---------
From: **Greg Williams** <gonasadaddy@gmail.com>
Date: Wed, Sep 12, 2018 at 2:17 PM
Subject: Williams move from Ashburn VA to Richland WA
To: <andy@qsmoving.com>

Andy

To help you in proposing a price adjustment, attached is a chronology. At the end are summary lessons QSM  might use to improve business operations. Most businesses pay consultants for such advice.

You told me this morning that there are bad actors on the customer side , which is why you take payment for work before items are moved into the customers' homes. But in this case, you must consider that QSM is the bad actor. I don't say this lightly. We chose QSM because we wanted to support a Veteran-owned, up and coming company. But we have been treated poorly throughout this process. With the exception of Angel, QSM personnel have yet to do a single thing they said they would do, when they said they would do it.

I hope you will take the attached advice to heart, as we would still like to see this company succeed.

Regards,
Greg Williams

PS: at 2:15, there is still no one here to help poor Angel...

Chronology of Moving Job for Williams – Ashburn VA to Richland WA.

Pick up Phase

Sales: Christopher Mitchum

- Came to Ashburn house in May to review the household items to be moved and provided estimate. First packout June 2 for storage prior to house going on the market.
- Came to Ashburn house again in early July to survey what remained to be moved. Set August 1 as pick up date; confirmed via email on July 11.
- Mitchum - An August 1 pick up means arrival about August 9 or 10.

August 1
- I called at 8:04am. Mitchum says "Arrival time is between 8-10am; they should be in route now."
- 10:40am – no sign of truck. Called Mitchum; says he will check.
- 12:27pm – called Mitchum; "crew was delayed getting out...I'll try to get you an ETA."
- 1:02 – received email from Mitchum; "There is a problem...they will have to send a crew out tomorrow morning." [I have to now change my flight from IAD to the next day at a cost of $627.]
- 3:37pm – I call Mitchum to confirm plan for 8/2, informing him of the expectation the crew be at the house by 8am and out by 11:30am to permit cleaning and walk thru by new owners, as well as expectation that QSM will have to cover my plane change cost. 3:41 – Mitchum "I have it."
- 4:04pm – Mitchum says the crew will leave Lorton by 7am.

August 2
- 8:15 – no crew; I call Mitchum. 8:55 – he response "dispatch shows crew is in route."
- 11:30 – crew arrives. They do a walk thru – "we will be gone by 3pm."
- 1:30 – crew determines they will need another truck.
- 1:59 – Mitchell sends text; "saw your voicemail; just left a message for dispatch. They are sending another crew now."
- 3:01 Mitchell – "Dispatch informs me they will be able to get it done today. I will call you back when I'm out of my meeting." [Last word from Mitchell – I never hear from him again. Crew advises me to start talking directly to Dispatch.]
- 4:30  Second truck arrives. Realtor's cleaning crew has been sitting in the driveway for an hour waiting to get in so they can clean prior to new owners' walk thru that evening. Every room in the house still has stuff in it.
- 6:50pm – two crews still working. New owner wants to do walk-around at 7pm, so I leave to check into a hotel.
- 8pm – I get a phone call from Tori (crew packer). "We're finishing up; come back to sign the paperwork." I arrive 10 min later; crew is folding up blankets and straps. Tori has me sign the inventory and time in/time out sheet. THEN she tells me that there are still

furniture items and they will have to send another truck in the morning. (I try not to crap my pants...)  I give Tori my realtor's phone number because I am on a (rescheduled) flight to Washington early the next morning.

August 3

- 10:13am – I am now in the Denver airport. My realtor calls to say there is stuff still in the house!  No one from QSM has called her despite the conversation with Tori at the end of the evening before.
- Noon – Realtor tells me she called QSM  - the crew from the night before never told their management that another truck was needed!
- 12:30pm – I call QSM and speak with Andy; he says no one told him there was still stuff at the house, and he can't explain why. I inform him that Tori lied to me at the end of August 3 about what had been accomplished. [Sharply worded phone call in which I threaten to rain down hell in his company—I don't like being lied to. And QSM's failure to accomplished what was promised for Aug 3 means the closing on the house in Ashburn is delayed, meaning the closing on the house in Richland is delayed 3 days. [Have to procure lodging in Richland at Hotel2 for three days].

Transport/Deliver Phase

- August 8 – 2:06pm – I call QSM to get an estimate on when our stuff will arrive. LeAnn says window is 8/17-24.
- August 14 – I call QSM for status. "Items being crated...arrival will be toward the end of the 8/17-24 window...will call back with status."  No return call after two days. So...
- August 16 – I call QSM for status. "Crating will finish tomorrow. ETA is 27th."  I note this is now 2.5 weeks from original estimate from Mitchum. How is that factored into price? LeAnn says there will be an adjustment in price; she will call and let me know. No return call after 5 days, so...
- August 22 – I call QSM and talk to Andy. Schedule is now "end of next week" (8/27). Said issue is driver availability, and some items still being crated. I asked if there is something unusual about our job; "no, other customers with similar situations." I inquired about price adjustment based on schedule. Andy said yes, and he would call me by Saturday morning. Saturday came and went; no phone call. So...
- August 29 – I called QSM and talked to Andy. He said our load would be picked up tomorrow (8/30). He said he was not sure how the next days would go given the Labor Day weekend, but he would check and call me.  No call back, so...
- Sept 1 – I called QSM and talked to LeAnn. She said our items would leave VA on 9/2. I asked about arrival date. She transferred me. No pickup after 5 min, so hung up.
- Sept 3 – I called QSM and talked to Andy; says truck is leaving today, arriving in 9/10-12 window. Said driver would call me with expected specific arrival date. No call, so...
- Sept 10 – I called QSM; dispatch says arrival on 9/13.

- Sept 10 afternoon – Driver calls to say arrival on 9/12. CONGRATULATIONS AND THANK YOU, ANGEL! YOU ARE THE FIRST QSM PERSON TO CALL ME IN OVER A MONTH!
- Sept 12 – Angel arrives at 11am with truck. Local support crew is supposed to be here at this same time. Informs us that After an hour, no show, so Angel starts unloading himself, with my wife doing the inventory because no one else is here to do so. Spoke to Andy around noon; he asks for and I make the requested 40% payment. As of 2pm, local crew has not arrived yet! Angel is unloading by himself.
- The consequences of delayed delivery and lack of communication are numerous. For example, we had to procure school supplies and clothes for my daughter that we already owned but were inaccessible to us. I had to miss a major opportunity to participate in a 3 day event at my daughter's school because our items' arrival landed in that window.

## Summary – Lessons for QSM

- No apparent communication between Sales and Operations.
- Both Sales and Operations personnel under-estimated quantity and times for pack out.
- Sales does not follow the operation thru with the customer, so the customer has to talk directly to Operations.
- QSM never initiates phone calls with customer. Contrast this with the company that shipped our car, which sent daily emails with progress, and initiated calls with us to coordinate final delivery. In addition, 1-800-GotJunk called us multiple times to confirm appointment times and progress – we got better comm from someone moving our trash than from QSM!
- QSM Operations has internal communications problems. The August 2 crew never told QSM management that items were left over that needed to be picked up the next day.
- Operations has an integrity issue, with staff intentionally mis-leading both the customer and Operations management.
- QSM does not acknowledge the problems it causes the customer. I got an explanation about how the "transportation industry" works, but to the customer that is irrelevant. What matters to the customer is the cost in time and money of changing plane flights, delayed home sale closings, and missed opportunities when promises are not met and communication is absent.

---------- Forwarded message ---------
From: Ed Graves <Ed@qsmoving.com>
Date: Thu, Sep 13, 2018 at 4:52 PM
Subject: Mutual Release Williams move from Ashburn VA to Richland WA
To: Greg Williams <gonasadaddy@gmail.com>


Mr. Williams,


I have read the word document that you previously sent us.  In order for us to give you the discount that you are asking for in its entirety.  We must have the enclosed Mutual release signed by you and your wife.  After signing, you can send us a picture of the signature page and give the original signatures to Angel.  This will allow you to take the entire $4117 credit that you asked for.  The remaining balance after your requested discount is $4825.


As I stated on the phone, we apologize for the late delivery of your household goods.   We absolutely wanted to have your goods to you within the delivery window.   We feel terrible that it took so long to get your things to Richland, WA.


Ed Graves

## MUTUAL RELEASE AND SETTLEMENT AGREEMENT

Quality **Midwestern Holdings, Inc. dba Quality Services Moving** (herein "Quality") hereby agrees with **Greg and Rachelue Williams** (hereinafter "the Williams") (hereinafter collectively "the parties") to settle all outstanding disputes between them and make a final, full and complete settlement of any and all claims and actions as set forth below.

In consideration of:

A discounted relocation to Washington state whereby Quality agrees to a reduction of the $15,242 dollars in lawfully incurred line haul charges a discount of the sum by **$4,117.00 (Four Thousand One Hundred and Seventeen Dollars)** Making the total sum of payments of William's to Quality $11,125; and

Greg and Rachelue Williams upon the return of this executed agreement, agree to withdraw any reviews, complaints or legal actions in their entirety and deleting any internet postings about Quality or its corporate affiliates, businesses or employees, and ceasing and desisting from ANY future negative postings about Quality or its corporate affiliates, businesses or employees;

Now therefore:

**Quality**, its employees, agents, partners, parents, affiliates, officers, directors, assignees, transferees, and/or successors in interest, and

**Greg and Rachelue Williams**, and their employees, agents, partners, parents, affiliates, officers, directors, assignees, extended family, transferees, and/or successors in interest,

do hereby irrevocably, unconditionally and completely discharge, release and hold harmless the other from any and all claims, demands, losses, expenses or other matters alleged and/or claimed, or which could have been

alleged and/or claimed, or which may in the future be alleged and/or claimed, and/or regarding or in any way arising out of:

The moving and/or storage of Greg and Rachelue Williams's goods by Quality and/or the transportation by Quality of her goods through the date of this agreement; any representations, actions, offers or agreements by Quality relating to the aforesaid storage and/or transportation; any charges for the storage, transportation, or valuation of her goods; and related to any and all claims stated by the parties or which could have been stated by either party.

The undersigned represent and warrant, with the intention of reliance thereon, that each has all necessary and proper authority to sign this Mutual Release and Settlement Agreement and to settle and release each other regarding the aforesaid matters.

All parties acknowledge and agree that the execution of this Mutual Release neither constitutes nor shall be construed as an admission of any liability by the parties hereto.

The parties further represent and warrant that they have not submitted, assigned or transferred any interest in any claim and/or matter referenced, settled or released herein to any third party.

The parties further agree that breach of the provisions of this agreement by either party will entitle the other to damages for its breach.

The parties further agree to keep the terms and existence of this Settlement Agreement in strict confidentiality, with the exception of attorney-client privileged discussion with their counsel if any.

This Agreement is enforceable in any court of competent jurisdiction and may be executed in as many counterparts as may be necessary and each such counterpart so executed will be deemed to be an original and such counterparts together will constitute one and the same instrument. Counterparts may be delivered by facsimile and such facsimile copies of signatures shall be deemed to be originals for the purpose of this Agreement. The Williams agree that the venue of any action brought by them will be Fairfax County Virginia. Should Quality have to defend any action brought by the Williams or enforce any provision of this agreement after willful violation by the Williams. Quality will be entitled to damages and attorney's fees in the amount of $10,000. (Ten Thousand Dollars)

THE PARTIES EXPRESSLY ACKNOWLEDGE AND AGREE that the aforementioned agreement constitutes the whole consideration for the Mutual Release, that there are no representations, promises or obligations except as specifically expressed herein, that they have reviewed this agreement with or without counsel of their choosing and are satisfied with the same, and that this agreement can only be modified in writing.

Date: _____

QUALITY MIDWESTERN HOLDINGS, INC. DBA QUALITY SERVICES MOVING

Print Name: _Ed Graves_

Position: _President_

Date: _____

Greg Williams

Date: _____

Rachelue Williams

## PARTIAL RELEASE AND SETTLEMENT

This Agreement dated September ___, 2018 by and between Quality Midwestern Holdings, Inc. d/b/a Quality Services Moving ("Quality") and Greg and Rachelue Williams ("Williams") provides as follows:

WHEREAS, Williams hired Quality to transport furnishings and household items from Ashburn, Virginia to Richland, Washington;

WHEREAS, Williams was not satisfied with the time and manner in which the transportation was conducted;

WHEREAS, Quality desires to provide a reduction in the price of services in exchange for Williams voluntarily agreeing to not disparage or disclose their dissatisfaction with the services provided by Quality to the public at-large;

WHEREAS, Williams desires to accept this reduction in the price of services in exchange for agreeing not to disparage or disclose their dissatisfaction with the services provided by Quality to the public at-large;

WHEREAS, the parties understand and acknowledge that this Agreement does not address any claims regarding physical damage to the transported goods and that Williams reserves any and all claims against Quality related thereto.

NOW, WHEREFORE, the parties agree as follows:

1.  **Reduction in Price**. Quality shall discount the cost of transportation services to Williams in the amount of Four Thousand One Hundred and Seventeen Dollars ($4,117.00). The parties agree that upon completion of services, the amount due and owing from Williams to Quality shall be Four Thousand Eight Hundred Dollars and Twenty Five Dollars ($4,825.00), except as otherwise provided in this agreement.

2.  **Non-Disparagement and Non-Disclosure.** Each party agrees not to make any public statements or communications in any medium, including social networking media, that disparages of defames the other or otherwise discloses the Williams' dissatisfaction with the services provided by Quality in relation to the transportation of household goods and furnishings from Fairfax Virginia to Richland Washington. Any previous communications or statements regarding the same must be promptly deleted or

RELEASE AND SETTLEMENT OF CLAIMS - 1

removal thereof must be promptly requested. The parties further agree that this Agreement shall not be otherwise disclosed accept in a proceeding to enforce the terms herein.

3.    **Mutual Release**. The Parties hereby mutually release, acquit and forever discharge each other and their respective corporate parents, subsidiaries and affiliates, predecessors and successors, and their respective officers, directors, employees, independent contractors and attorneys from any and all present or future claims, cross-claims, demands, suits, actions, damages, costs and causes of action, whether contingent, known or unknown, relating to the Dispute or that could have been raised in the Dispute except:

a.    The Parties do not release each other from the terms, conditions and promises set out in this Agreement or any other agreement that does not refer or relate to the Dispute.

b.    Quality does not release any claim against Williams for payment of reduced cost of transportation services as set forth in Section 1 of this Agreement.

c.    Williams does not release any claims against Quality for or related to physical damage to the transported items occurring during the course of transport or while the goods were in the possession or control of Quality and its respective employees, agents and contractors.

4.    **Compromise.**    The Parties agree that this Agreement involves a settlement of claims which, except as expressly set forth herein, are denied by the Parties and that the consideration given for this Agreement is in no way to be construed as an admission of liability and is, in fact, not an admission of liability.

5.    **Opportunity to Confer With Counsel.**    All Parties represent that they have had an opportunity to consult with their respective counsel and are fully advised concerning their rights with respect to the execution of this Agreement and related documents, and the release contained herein and that each Party fully understands the same.

RELEASE AND SETTLEMENT OF CLAIMS - 2

6.     **Integration**. This Agreement represents the full and complete agreement of the Parties hereto and supersedes any and all prior verbal and written understandings regarding its subject matter.

7.     **Warranty of Authority**. Each person signing this Agreement represents and warrants that he or she has been duly authorized to enter into this Agreement by the Party on whose behalf he or she is signing.

8.     **Voluntary Execution**. The Parties represent that they understand and agree that this Agreement is made and entered into as their free and voluntary act.

9.     **Governing Law**. This Agreement shall be interpreted, construed and enforced in accordance with Washington law.

10.     **Counterparts**. This Agreement may be executed in several counterparts by one or more of the Parties named herein and all such counterparts once so executed shall together be deemed to constitute one final agreement, as if one document had been signed by all Parties hereto; and each such counterpart, upon execution and delivery, shall be deemed a complete original, binding on the Parties to this Agreement. This Agreement may also be executed by facsimile, which facsimile signature shall be deemed an original signature.

11.     **Binding Effect**. Unless otherwise provided, this Agreement and the terms, covenants, conditions, provisions, obligations, undertakings, rights and benefits hereto shall be binding upon and shall inure to the benefit of the Parties and their respective heirs, executors, administrators, creditors, representatives, successors and assigns.

12.     **Arbitration**. If any claims or disputes arise out of this Agreement, the parties hereby agree to submit the same to binding arbitration at a location to be mutually agreed upon in Benton County, Washington. In the event the parties are unable to agree upon an arbitrator, or a location, the selections will be made by the presiding judge for the Benton County Superior Court at the request of either party. RCW 7.04A and the mandatory arbitration rules of Benton County Superior Court shall be binding as to the procedure. The prevailing party in such actions shall be entitled to recover reasonable attorney's fees.

RELEASE AND SETTLEMENT OF CLAIMS - 3

13.    **Confidentiality.**  This Agreement is confidential.  Its contents, as well as any drafts, correspondence and/or oral communications concerning its contents may not be disclosed to third parties following execution of this Agreement without the express written consent of the Parties hereto, except as may be necessary to enforce this Agreement.  For purposes of this paragraph, the term "third parties" does not include any attorney, accountant, consultant, insurer, or creditor for any Party.

14.    **Attorneys' Fees.**  Each Party hereto waives any claims for attorneys' fees and costs against any other Party arising from or connected with the Dispute, preparation and execution of the Agreement, and the matters and documents referred to therein.

QUALITY MIDWESTERN HOLDINGS, INC.
D/B/A Quality Services Moving

_____    _____
**By: Ed Graves, President**    **Dated**

_____    _____
**GREG WILLIAMS**    **Dated**

_____    _____
**RACHELUE WILLIAMS**    **Dated**

RELEASE AND SETTLEMENT OF CLAIMS - 4

On Sep 14, 2018, at 10:02 AM, Ed Graves <Ed@QSMoving.com> wrote:

Mr. Williams,

This will have to be taken down per our pending agreement.  I will also insist on a monetary penalty within the agreement in the event of a breach now that I see what is being done on your side behind the scenes.

Ed Graves

**From:** Bret Uhrich
**Sent:** Friday, September 14, 2018 11:17 AM
**To:** Ed Graves <Ed@QSMoving.com>
**Cc:** Greg Williams <gonasadaddy@gmail.com>; Karol Melde <kmelde@walkerheye.com>
**Subject:** Re: Williams Release

I would recommend that all proposed changes be rejected. Williams doesn't have any ability to get negative comments removed from third-party websites beyond requesting they be removed and the website voluntarily complying. Williams isn't going to go to Virginia to resolve any dispute. Absent an agreement to the contrary proper venue and law is almost assuredly Washington.

Sent from my iPhone

**From:** Ed Graves <Ed@QSMoving.com>
**Sent:** Friday, September 14, 2018 11:56 AM
**To:** Greg Williams <gonasadaddy@gmail.com>; Bret Uhrich <BUhrich@walkerheye.com>
**Cc:** Karol Melde <kmelde@walkerheye.com>
**Subject:** RE: Williams Release

With the existence of 1 negative review already written then the point of the agreement is moot isn't it? Williams is already displaying a disregard for the spirit and letter of the agreement.

The AMSA arbitration program does not require anyone to travel anywhere which is why it is the best option should arbitration be necessary.

The venue is set to VA because at the time the contract was ratified, The Williams were residents of VA, entering into a contract with a VA corporation. For work that originated In VA. Additionally, the tariff that Quality has on file with the Federal Highway Administration already lists Virginia as the venue. Making the inclusion of WA in this proposed agreement moot.

We can reject the changes all day long. That doesn't move the issue to resolution. In the absence of any agreement, Quality will charge full price for the relocation services, take our chances with the reviews and enjoy the protections that the Carmack amendment provides. But I don't think that's what either party wants.

Ed

**From:** Greg Williams <gonasadaddy@gmail.com>
**Sent:** Friday, September 14, 2018 12:29 PM
**To:** Karol Melde <kmelde@walkerheye.com>
**Cc:** Bret Uhrich <BUhrich@walkerheye.com>
**Subject:** Re: Williams Release

Bret , Carol

QSM just issued a stop work order to their delivery guys who were unloading at our home. They have now driven away with a fourth of our household goods still on their truck.

This after I paid them their requested 40% on Wed and this morning at their request authorized them to charge my card the balance due (less the $4117 in the draft agreement).

This, on the basis of lack of completion of the draft mutual agreement alone, they have taken the above action.

We have just called the BBB, who had advised us to call the WA attorney general's office.

Please help us get this resolved today if possible !

Thanks!
Greg

Williams Estimate of Value of Missing Goods

| Item | Value | Note |
|---|---|---|
| Custom-made China Cabinet | 6000 | Lower half missing; we designed ourselves and a master craftsman built it. |
| Master King Bed | 2600 | Headboard and part of structure missing, scratched; confirmed from receipt |
| King Bed Mattress | 1500 | |
| Master Night Stands | 500 | |
| Chival Mirror | 1200 | Stand missing |
| Chival Mirror | 500 | Stand missing |
| Antique Swooning Couch | 2000 | Hard to value; antique, handcarved, horsehair; belonged to Grandmother |
| Melle Carrara vacuum | 700 | confirmed via website |
| Sebo vacuum - HEPA | 700 | confirmed via website |
| Custom-made Queen platform bed with drawers | 1500 | |
| Child's oak wood desk | 200 | Drawers missing |
| Lane Hope Chest | 300 | |
| Stainless steel top/cherry leg craft table | 1000 | |
| Elna 6000 sewing machine | 500 | |
| Wingback white chair | 300 | |
| Solid wood bookcase | 250 | |
| 6 drawer supply case full of office supplies | 500 | |
| Cherry dining room table and chairs | 3000 | We have one chair; the rest is missing. |
| Sectional couch with sofabed - Marshfield | 2000 | We have one half |
| Upholstered swivel chair - Paladian | 350 | We have one of two matching |
| Porclain Asian Lamp | 200 | |
| Wingback white chair | 3000 | we have table top but no legs; have 2 of 6 chairs |
| Williams-Sonoma dishes and glasses | 500 | |
| Four-level metal and black slate stand | 500 | |
| Two cat trees | 250 | |
| Stennis Queen Anne coffee table and two end tables | 600 | |
| Lamps | 400 | |
| Bose wave music system | 500 | confirmed via website |
| Lincoln-style solid walnut executive office desk | 4000 | found comparable on HH website |
| Box of clothes ( incl daugter's leather jacket, sports jerseys) | 500 | |

| | |
|---|---|
| Guest leather office chair | 300 |
| Museum bookcase wall (2) | 4000 Fluted trim and curved molding; 1 delivered; side molding broken off & missing; no shelves |
| About half my library; these are academic texts not novels | 3000 |
| Patio furniture - Woodard cast aluminum | 4000 Table and four swivel rocking chairs plus matching small table and two chairs |
| Air compresser and associated tools | 300 |
| Garage tools | 500 |
| Werner aluminum ladder | 50 |
| KitchenAid mixer | 350 |
| Thomas Kincaid painting | 2000 |
| Drafting table | 200 |
| | |
| Total | 50750 |

**Williams Estimate of Value of Damaged Goods**

| | |
|---|---|
| Mirror and Frame for Antique Lady's Dresser | 500 Mirror shattered and frame broken |
| Queen size futon frame | 200 Broken |
| End table | 300 Matching pair—one smashed beyond repair |
| Hinkle-Harris server | 1500 Gouges |
| Various lamps & shades | 200 |
| | |
| Total | 2700 |

Message received from the business about your complaint                    https://bluecomplaints.bbb.org/Message.aspx?msg=28914835&chk=4n...



BBB serving Metro Washington DC and Eastern Pennsylvania
1411 K St. NW, 10th Floor
Washington DC 20005-3404
PHONE:(202)393-8000 FAX:(202)393-1198

10/10/2018

Rachelue Williams
1320 Westgate Way
Richland WA 99352

Re:   Complaint ID  13095171;  Quality Services Moving & Delivery

Dear Rachelue Williams:

The company responded to your submission and we are passing it along to you.  The contents of this message are below or attached.  Please respond to this message in written form within 10 days.

The text of your complaint may be publicly posted on BBBs Web site (BBB reserves the right to not post in accordance with BBB policy). Please do not include any personally identifiable information when you tell us about your problem or in your desired outcome. By submitting your complaint, you are representing that it is a truthful account of your experience with the business. BBB may edit your complaint to protect privacy rights and to remove inappropriate language.

Sincerely,

Marcia Tilghman
Dispute Resolution Analyst
mtilghman@mybbb.org
Phone: 202-558-4643

MESSAGE FROM BUSINESS:

Dear Sirs:

We are seeking legal action again complaint as this customer owes our company $7,000.00 for services rendered.  We will provide the BBB with an update once the legal proceedings have been completed and final determination is made by the court regarding this matter.


Thank you